**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.________________

NANCY FITZGERALD, individually and on behalf of all others similarly situated,

Plaintiff,

v.

DRAFTKINGS INC.,
DK CROWN HOLDINGS INC., and
CROWN GAMING INC.,

Defendants.

**CLASS ACTION COMPLAINT**

## INTRODUCTION

Plaintiff Nancy Fitzgerald ("Plaintiff"), by and through her counsel, submits this Class Action Complaint against Defendants DraftKings Inc., DK Crown Holdings Inc., and Crown Gaming Inc. (collectively, "DraftKings" or the "Company") on behalf of herself and all others similarly situated, and alleges the following upon information and belief, except as to those allegations concerning Plaintiff's own user-side experience, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by DraftKings with the United States Securities and Exchange Commission ("SEC"); (ii) information publicly available on DraftKings's website;[1] and (iii) other available information concerning DraftKings and sports betting.

## NATURE OF THE ACTION

1. This is a class action asserted against DraftKings by Plaintiff on behalf of herself and all others similarly situated for violations of Massachusetts General Laws chapter 93A (the "Massachusetts Consumer Protection Act" or "MCPA") and the regulations promulgated thereunder, Colorado Revised Statutes § 6, art. 1 (the "Colorado Consumer Protection Act" or "CCPA"), and unjust enrichment.

2. DraftKings is a gambling company that offers online and retail sports betting services ("Sportsbook" services) and fantasy sports services through its online platform.

3. DraftKings's platform employs deceptive interface design patterns, otherwise known as "dark patterns." These patterns cause consumers to place unintended bets. As it relates

[1] https://www.draftkings.com.

to odds changes, the deceptive design interface is two-fold. First, shifting wager flow patterns habituate consumers to reasonably expect more opportunities to review, finalize, and accept odds changes than they may actually receive, leading consumers to inadvertently finalize bets. Second, prompts to accept odds changes are large and prominent, while the information about the new odds and how they changed are presented in much smaller print. As a result, consumers are duped into placing bets that they do not intend to.

4. DraftKings's deceptive interface design pattern constitutes an unfair trade practice under both Massachusetts and Colorado law.

5. In addition to maintaining a deceptive interface design pattern for handling odds changes, DraftKings wrongfully refuses to refund users for unintentionally placed bets. DraftKings has thus been unjustly enriched by the amounts of the unintentionally placed wagers it has refused to refund.

6. As a direct and proximate result of the misconduct described herein by DraftKings, Plaintiff and Class Members (defined below) have sustained damages as explained below. Plaintiff and Class Members seek monetary relief, attorney's fees and costs, and a change to the misleading practices employed by DraftKings.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) and (6) (the "Class Action Fairness Act of 2005" or "CAFA") because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiff and Defendants are citizens of different states.

8. This Court has personal jurisdiction over each Defendant because each Defendant has consented to personal jurisdiction in this District and has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. DraftKings's Colorado Terms of Use provide that this Court shall have "exclusive jurisdiction . . . for proceedings involving any and all disputes, claims or controversies arising out of or relating to . . . any use of the [DraftKings] Website (including all commercial transactions conducted through the Website)." Plaintiff's claims and those of putative Class Members arise out of their use of DraftKings's website.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of Defendants' wrongful acts occurred in this District.

## PARTIES

10. Plaintiff is an individual who resides in Englewood, Colorado and maintains a DraftKings account.

11. Defendant DraftKings Inc. is a Nevada corporation with its principal place of business in Boston, Massachusetts. DraftKings Inc. owns and operates the DraftKings website.

12. Defendant DK Crown Holdings Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts. DK Crown Holdings Inc. is a wholly owned subsidiary of DraftKings Inc.[2]

---

[2] Prior to August 9, 2021, DK Crown Holdings Inc. was known as DraftKings Inc. ("Old DraftKings"). On May 5, 2022, Old DraftKings acquired Golden Nugget Online Gaming, Inc. through a holding company reorganization. Pursuant to that reorganization, Old DraftKings became a wholly owned subsidiary of New Duke Holdco, Inc. ("New DraftKings"). New DraftKings was then renamed to DraftKings Inc., with Old DraftKings being renamed DK Crown Holdings Inc.

13. Defendant Crown Gaming Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts. According to DraftKings's website, Crown Gaming Inc. operates the DraftKings Sportsbook website and the DraftKings Sportsbook and Casino mobile application.

14. Plaintiff is informed and believes, and on that basis alleges, that each Defendant named in this action was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative, and/or associate of each of the other Defendants, and was at all times relevant herein acting within the course and scope of his, her, or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative, and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other Defendants.

## BACKGROUND

***DraftKings Background***

15. DraftKings is a gambling company founded in 2012 and based in Boston, Massachusetts. It went public in 2020.

16. As of the date of this Complaint, DraftKings claims to offer Sportsbook services, including through its mobile sports betting app, in 29 states, including Colorado, as well as in Washington, D.C. and Puerto Rico.

17. DraftKings controls the information posted on its website and its app, including the advertised odds for particular bets and the way in which odds changes are disclosed to users while they are in the process of placing bets.

18. DraftKings reported revenues of over $3.5 billion in 2023, over $4.5 billion in 2024, and over $6 billion in 2025, as well as total amounts of wagers placed through its Sportsbook services ("Sportsbook Handle") of over $37 billion, over $48 billion, and over $53 billion, respectively.

19. DraftKings claims that it is "committed to responsibly creating games and betting experiences," and that it aims to "build the best, most trusted, and most customer-centric destination for fans."[3]

***Sports Betting Background***

20. Sports betting involves placing wagers on the outcome of a sporting event at fixed odds. The odds set by the Sportsbook dictate the amount paid to customers in the event that their wagers are successful and are reflective of the implied probability of the wager succeeding. "Negative" odds signal that the bet is favored to win, whereas "positive" odds signal that the bet is an "underdog." For "positive" or "underdog" bets, the odds correspond to the amount that will be *returned* on a $100 wager. For instance, if a customer places a $100 wager at "+200" odds and their bet is successful, they will win $200 in profit ($300 total, including the return of their original $100 wager). For "negative" or favored bets, the odds correspond to the amount the customer needs to *wager* to win $100 in profit. For instance, if the odds for a particular bet are set at "-200,"

[3] https://www.draftkings.com/who-we-are-about.

the customer will need to wager $200 in order to make a $100 profit in the event that their bet wins.

21. Sportsbook companies like DraftKings offer various types of wagers on sporting events, such as “moneyline”[4] bets and “point spread” or “line”[5] bets.

22. Because a change in odds materially affects both the implied probability of the bet succeeding and the amount that the bettor stands to win if their bet is successful, bettors may change their decision to place a bet based on odds changes. A bettor’s choice to place a wager is fundamentally based on the bettor’s assessment of whether the odds for a particular bet provide sufficient value relative to the bettor’s assessment of the probability of the outcome.

23. For instance, a bettor who is not particularly confident in the Rockies’s chances of beating the Red Sox might nevertheless choose to bet on them at a +2.5 point spread when the odds are at +400, because the potential upside of $400 on a $100 bet is worth the risk of the bet failing. But if the odds slide back down to +200, the bettor may choose not to place the bet, because the risk of the bet failing is outweighed by the potential upside of a $200 gain.

---

[4] A “moneyline” bet is a wager on which of two teams in a contest will win a game. For instance, if DraftKings offers a customer a moneyline bet on a baseball game between the Colorado Rockies and the Boston Red Sox where the Rockies are “+200” to beat the Red Sox, the customer will win $200 on a $100 bet if the Rockies win the game.

[5] A “point spread” or “line” bet is one where, rather than simply betting on the outcome of a game, the customer bets on the number of points by which one team will win or lose. Returning to the Rockies vs. Red Sox example, suppose DraftKings offers a customer a point spread bet in which the Rockies are “+2.5” against the Red Sox, again at “+200” odds. The customer will win $200 on a $100 bet if the Rockies either win the game or lose by fewer than 2.5 runs. On the other hand, if DraftKings offers “+200” odds on a bet where the Red Sox are “-2.5” against the Rockies, the customer will win $200 on a $100 bet only if the Red Sox beat the Rockies by more than 2.5 runs.

24. Ultimately, the bettor's decision to place or not place a bet is rooted in their individual analysis of the risk-reward balance presented by the odds.

***Background on Deceptive Interface Design and "Dark Patterns"***

25. In recent years, researchers and governments have become increasingly concerned about the use of "dark patterns" in web and mobile interface design to influence consumer decision-making in ways that are harmful to consumers. As discussed in a September 2022 staff report by the Federal Trade Commission ("FTC"), the term "dark patterns," which was first coined by designer Harry Brignull, generally refers to "design practices that trick or manipulate users into making choices they would not otherwise have made[.]"[6]

26. Research suggests that certain types of "dark patterns" are particularly pervasive in mobile app ecosystems. An April 2020 study of 240 popular mobile apps by researchers at the University of Zürich in Switzerland found that 95% of the analyzed apps contained one or more "dark patterns," with an average of seven "dark patterns" per app.[7] Further, an October 2021 study by researchers at Northeastern University in Boston found that mobile apps were more likely than websites and non-mobile interfaces to employ the tactic of "visual option precedence," where a

---

[6] FTC Staff, *Bringing Dark Patterns to Light* 2 (2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf.

[7] *See* Linda Di Geronimo, et al., *UI Dark Patterns and Where to Find Them: A Study on Mobile Applications and User Perception*, Proceedings of the 2020 CHI Conference on Human Factors in Computing Systems, Apr. 2020, at 1, 5.

user is presented with multiple choices but a "dark pattern" is used to make one choice more visually or interactively appealing than others in order to manipulate users' behavior.[8]

27. In recent years, the Colorado legislature has taken action to address the use of "dark patterns" in the collection of consumers' personal data. On July 7, 2021, the Governor of Colorado signed the Colorado Privacy Act into law, which is now codified at Colorado Revised Statutes § 6, art. 1, as part of the Colorado Consumer Protection Act. Among other things, the Colorado Privacy Act requires those who process and sell consumers' sensitive personal data to obtain consumers' consent before doing so, and explicitly prohibits the use of "dark patterns" in obtaining consent. Furthermore, the Colorado Privacy Act empowers the attorney general of Colorado to bring enforcement actions against those who control and process personal data in violation of the statute, and provides that for the purposes of such an enforcement action, a violation of the Colorado Privacy Act constitutes a deceptive trade practice. *See* Colo. Rev. Stat. § 6-1-1311.

28. Subsequently, the Colorado attorney general has promulgated additional rules for the purpose of administering the Colorado Privacy Act. These rules provide guidance on designing user interfaces to avoid the use of "dark patterns" in obtaining consent. Specifically, the rules provide that "[c]ontrollers shall not use an interface design or choice architecture to obtain required Consent that has been designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making or choice, or unfairly, fraudulently, or deceptively manipulating or coercing a Consumer into providing Consent." Colo. Code Regs. § 904-3 (2023).

---

[8] *See* Johanna Gunawan, et al., *A Comparative Study of Dark Patterns Across Mobile and Web Modalities*, Proceedings of the ACM on Human-Computer Interaction, Vol. 5, Issue CSCW2, Oct. 2021, at 9, 17 n.18, 19, 21

The rules list examples of improper "dark patterns," including presenting one consent choice option "with less prominent size, font, or styling than the other choice." *Id.*

29. While the Colorado Privacy Act applies specifically in the context of consumer personal data protection, its recent passage highlights the fact that the state is concerned about the impact of "dark patterns" on consumers' ability to make informed choices when navigating online and mobile interfaces.

**DEFENDANTS' MISLEADING AND/OR DECEPTIVE CONDUCT**

30. DraftKings maintains a deceptive user interface for reviewing and accepting odds changes that employs "dark patterns." This deceptive interface causes consumers to unintentionally place bets when the odds on those bets change during the wagering process.

31. There are three essential components to complete the DraftKings wagering process. First the consumer selects the bet, then the consumer places the bet, and finally, DraftKings accepts or declines the bet. A bet becomes final only if DraftKings accepts the bet.

32. When no odds changes occur during wagering, finalizing a bet is a three-step process (selection, placement, and acceptance by DraftKings). However, when the odds for a particular bet change after the consumer selects the bet, but before the bet is accepted as final, wagering can become a four- or five-step process.

33. Users can select from three settings for how DraftKings's platform handles odds changes that occur during the wagering process. Those settings are: (i) "Ask for Approval"; (ii) "Accept Higher Odds"; and (iii) "Accept Odds Changes."

34. When users have "Ask for Approval" or "Accept Higher Odds," one of three possibilities may occur. First, if an odds change occurs after a consumer selects a bet and adds it

to their bet slip, but before the consumer is prompted to place the bet, a pop-up appears with a large, centrally placed yellow button that prompts the user to "Accept Odds and Place Bet" (hereinafter referred to as a "Pre-Placement Odds Change Step"). Second, if an odds change occurs after a consumer has placed a bet, but before DraftKings accepts or declines the bet, the consumer is prompted with pop-up containing an "Action Required" warning banner, which prompts them to review the odds changes, and both an "Accept Odds and Place Bet" button (again conspicuously displayed in yellow) and a black "Leave in Bet Slip" button (hereinafter referred to as a "Post-Placement Odds Change Step"). Third, if the odds change at *both* junctures (*i.e.*, both before and after the customer places the bet), the consumer will receive *both* pop-ups in a five-step sequence (selection, Pre-Placement Odds Change Step, placement, Post-Placement Odds Change Step, and finalization).

35. Users with "Ask for Approval" or "Accept Higher Odds" selected frequently encounter the third possibility, particularly where the odds for a given bet are changing repeatedly in a short period of time. As a result, they may reasonably become conditioned to expect that finalizing a wager when odds changes occur during the placement process requires five steps.

36. This confusion is amplified by differences between the presentation of the Post-Placement Odds Change Step pop-up and the Pre-Placement Odds Change Step pop-up. In particular, the Post-Placement Odds Change Step pop-up contains an additional "Action Required" warning banner and language prompting the user to review the odds changes before making a decision. A second, black "Leave in Bet Slip" button is presented next to the yellow "Accept Odds and Place Bet" button, and the screen behind the pop-up (normally busy with colorful offers to place other bets) is blurred out. None of these elements are present in the Pre-Placement Odds

Change Step pop-up. And although the odds change information is still displayed in small print, there is less of a size difference between this information and the action buttons.

37. The Post-Placement Odds Change Step thus appears to users to be a "final review and action" step, whereas the Pre-Placement Odds Change Step appears to be a preliminary review step, after which further action will be required.

38. Nevertheless, when an odds change occurs *only* before the user places a bet, responding at the Pre-Placement Odds Change Step by pressing the large, conspicuous, yellow "Accept Odds" button immediately results in a bet being placed for the user and finalized by DraftKings at the updated odds. This leads to the placing and finalization of bets that users never intended to place.

39. DraftKings acknowledges that the consequences of clicking "Accept Odds" depends not only on the user's preference settings, but also on "the timing of the updated odds within a customer's bet placement journey."

40. Ultimately, in both the Pre-Placement Odds Change Step and Post-Placement Odds Change Step pop-ups, the actual odds change details – the new odds and potential payout – are presented less conspicuously than the large, yellow button prompting user to "Accept Odds and Place Bet."

41. DraftKings's interface for presenting users with odds change information employs deceptive "dark patterns" that lure users into finalizing bets that they do not intend to place.

42. DraftKings structures its interface for odds-changing wagering with a deceptive design that shifts behind the scenes. In many instances, users work through a five-step wager flow – conditioning them to expect two opportunities to accept changed odds. But then, in other

instances, consumers are only presented with a single odds change pop up, the one that occurs at the Pre-Placement Odds Change Step.

43. By sometimes using a five-step process for finalizing bets, and other times using a four-step process, DraftKings confuses users about what the final action step is on their end before their bet will be accepted and finalized by DraftKings. As a result, consumers are duped into thinking they are merely exploring their options to accept odds changes. This leads users to press the "Accept Odds" button without realizing that their acceptance will lock them into the wager.

44. Moreover, in both the five-step and four-step processes, critical information concerning how much the odds and payout for a given bet have changed is presented inconspicuously, while buttons prompting the user to take action are presented in large font with bright colors.

45. DraftKings provides users with an illusory choice between different preference settings for how odds changes are presented. Customers who select "Ask for Approval" reasonably expect that they will be provided with a meaningful opportunity to see and evaluate odds changes that occur while they are in the process of placing a bet, regardless of when that odds change takes place. Instead, even on the "Ask for Approval" setting, users are presented with a confusing process for evaluating and accepting odds changes, where the bet placement process is primarily governed not by their preference settings, but by factors outside of their control.

46. In maintaining its odds change policies, DraftKings intends that, or, in the alternative, knows or is reckless to a substantial risk that, users will be deceived into inadvertently finalizing bets when they press the "Accept Odds" button. DraftKings makes money when users place bets and has every incentive to ensure that they complete the bet placement process

notwithstanding odds changes that occur during that process. By employing a deceptive interface for processing odds changes during the bet placement process, DraftKings makes it more likely that users will still place their bets when the odds change – even if the users do not actually intend or desire to place their bets at the updated odds. This approach maximizes consumer risk and confusion while benefiting DraftKings's bottom line.

**PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS**

47. Plaintiff is a consumer who has used DraftKings to place multiple sports bets and who has been deceived by DraftKings's odds change interface into unintentionally placing bets that she had no desire to place on November 12, 2023 and November 13, 2023.

48. Prior to those dates, Plaintiff had placed wagers with DraftKings. During prior wagers, Plaintiff had encountered a five-step wagering process, in which she was presented with both the Pre-Placement Odds Change Step and Post-Placement Odds Change Step pop-ups. In those prior experiences, Plaintiff's bet was not finalized until after she proceeded through the Post-Placement Odds Change Step. Accordingly, Plaintiff reasonably believed that pressing "Accept Odds and Place Bet" on the Pre-Placement Odds Change Step pop-up was an intermediate step, and that finalization would come later.

49. On November 12, 2023, at approximately 11:00 A.M., Plaintiff inadvertently placed a $10,000 point spread bet on an NFL game between the Houston Texans and Cincinnati Bengals. Plaintiff selected a point spread bet on the Houston Texans to add to her bet slip, but before she could finalize the bet, the odds and point spread changed. Plaintiff was prompted with a large yellow "Accept Odds and Place Bet" button, which she pressed, assuming she would be

given the opportunity to review the changes to the odds and make an informed decision on whether to continue with the bet.

50. Instead, immediately after Plaintiff pressed the "Accept Odds" button, DraftKings finalized a -3.5 point spread bet for her on the Houston Texans at +100 odds. Both the point spread and the odds were different from the point spread and odds that had previously been displayed when Plaintiff first added the bet to her bet slip. Plaintiff did not intend to place this bet.

51. At this time, Plaintiff still believed that pressing "Accept Odds and Place Bet" would take her to a screen where she could review the odds changes on a bet before deciding whether to proceed with the bet at the updated odds. She assumed that she must have inadvertently "double-clicked" through this screen and pressed another button to finalize the bet. Plaintiff attributed the finalizing of her bet to user error and resolved to be more careful in the future.

52. On November 13, 2023, the following day, Plaintiff again inadvertently placed a bet due to DraftKings's deceptive interface. Specifically, around 6:15 p.m., Plaintiff added a $25,000 moneyline bet on the Buffalo Bills vs. the Denver Broncos to her bet slip. Once again, the odds on Plaintiff's bet changed while she was in the process of placing her bet. Once again, Plaintiff pressed "Accept Odds and Place Bet," making sure that she did not inadvertently "double-click."

53. When a bet was again immediately finalized for Plaintiff on the Bills moneyline at -190, Plaintiff realized that she had not erred the previous day. Instead, DraftKings had immediately finalized the bets for her when she pressed the "Accept Odds" button for the first time.

54. Plaintiff did not intend to place either of these bets, and would never have agreed to place them had she realized that pressing "Accept Odds and Place Bet" would result in the bets being immediately finalized by DraftKings. On both occasions, Plaintiff reasonably believed that pressing the "Accept Odds" button would take her to a screen where she would have the opportunity to view the updated odds and make an informed decision whether to proceed with the bets.

55. Following her second unintentionally placed bet, Plaintiff attempted to reach out to DraftKings to resolve the problem, but there was no number for her to call. When she tried reaching out on text messaging and chat systems, she encountered a bot that could not resolve the problem.

56. Plaintiff lost the full amount of her wager on both of these bets, which she never intended to place at the final odds.

57. DraftKings has refused to return the $35,000 Plaintiff inadvertently wagered as a consequence of DraftKings's deceptive user interface for displaying odds change information.

## CHOICE OF LAW ALLEGATIONS

58. DraftKings's Terms of Use contain different choice of law provisions depending on user location. The version of the Terms of Use that apply to Plaintiff provide, in relevant part, "[t]hese Terms of Use shall be governed by the internal substantive laws of the State of Colorado, without regard to its conflict of laws principles or any other law or regulation that would permit or require the application of the substantive laws of any jurisdiction other than the State of Colorado."

59. Unlike the Terms of Use's forum selection provisions, which apply to "any and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof,

or any use of the Website[,]" the Terms of Use's choice of law provision applies only to the Terms of Use itself. DraftKings's Terms of Use do not bar the parties thereto from asserting legal rights arising under the law of other jurisdictions.

60. DraftKings maintains its Sportsbook and controls the odds and availability of bets from its headquarters in Boston, Massachusetts. While DraftKings's customers access its Sportsbook in various states around the country, in each case, the creation and dissemination of DraftKings's deceptive user interface for placing bets occurs in Massachusetts.

## CLASS ACTION ALLEGATIONS

61. Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiff brings this action on behalf of herself and a class of similarly situated individuals. Subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action, Plaintiff seeks to represent the following proposed Nationwide Class and a Colorado Sub-Class:

> **Nationwide Class**: All persons in the United States who have placed bets with DraftKings where odds changes have occurred during the bet placement process and who have subsequently lost these bets.
>
> **Colorado Sub-Class**: All persons who have placed bets with DraftKings while located in the State of Colorado, or while subject to DraftKings's Colorado Terms of Use, where odds changes have occurred during the bet placement process and who have subsequently lost these bets.

62. Collectively, members of these two classes are referred to herein as "Class Members," and the two classes are collectively referred to herein as the "Class."

63. The Class Period begins from the length of the greatest applicable statute of limitations to the present.

64. Excluded from the Class are: (i) Defendants, any entity in which any Defendant has a controlling interest or which has a controlling interest in any Defendant, and Defendants' legal

representatives, predecessors, successors, and assigns; (ii) Defendants' employees, officers, directors, agents, and representatives and their family members; (iii) Class Counsel; and (iv) any judge to whom this case is assigned and any members of such judge's staff or immediate family.

65. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

66. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by DraftKings. DraftKings reported that it had an average of 2.7 million Monthly Unique Payers ("MUPs")[9] in fiscal year 2023, 3.7 million MUPs in fiscal year 2024, and 4.0 million MUPs in fiscal year 2025. Upon information and belief, given this high monthly customer count, and given the deceptive design of DraftKings's user interface, the number of customers who have unintentionally placed bets when attempting to view odds changes is so numerous that joinder of all these individuals would be impracticable under Federal Rule of Civil Procedure ("Rule") 23(a)(1).

67. **Commonality:** There are common questions of law and fact that exist as to all Class Members pursuant to Rule 23(a)(2). These common legal and factual issues include:

---

[9] DraftKings's annual report for fiscal year 2025, filed on Form 10-K with the SEC on February 13, 2026, states that the Company defines MUPs "as the number of unique paid users per month who had one or more real-money, paid engagements across one of more of [its] Sportsbook, iGaming, DFS, digital lottery courier, prediction markets or other product offerings via [its] technology."

a. Whether DraftKings's odds change policies, which are applicable to all users, constitute an unfair or deceptive act or practice within the meaning of the Massachusetts Consumer Protection Act and the regulations promulgated thereunder;

b. Whether DraftKings's odds change policies, which are applicable to all users, constitute an unfair or deceptive trade practice within the meaning of the Colorado Consumer Protection Act;

c. Whether Class Members have been injured as a result of DraftKings's use or employment of unfair or deceptive acts or practices within the meaning of the Massachusetts Consumer Protection Act, or as a result of DraftKings's use or employment of deceptive trade practices within the meaning of the Colorado Consumer Protection Act, in connection with its odds change policies;

d. Whether DraftKings's odds change policies or conduct in connection with its odds change policies violates other laws asserted herein;

e. Whether the Class Members have suffered damages as a result of the conduct alleged herein, and if so, the measure of such damages.

68. **Typicality:** Plaintiff's claims are typical of the claims of the Class Members whom she seeks to represent under Rule 23(a)(3) because Plaintiff and each Class Member placed bets with DraftKings where the odds changed during the bet placement process, triggering DraftKings's deceptive interface for viewing and accepting odds changes during the placing of a bet. Further, Plaintiff and Class Members have all sustained economic injuries arising out of DraftKings's

wrongful conduct in the form of funds lost as a result of unintentionally placed bets. Although atypical claims may exist, including those involving gambling addiction-related claims or other personal injury claims in connection with gambling activity, those claims are explicitly excluded from the definition of the Class. Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent Class Members.

69. **Adequacy of Representation**: Plaintiff will adequately and fairly represent and protect the interests of the Class Members within the meaning of Rule 23(a)(4). Plaintiff's interests do not conflict with the interests of other Class Members. She has retained counsel competent and experienced in prosecuting complex class action litigation, including consumer protection class actions, and intends to prosecute this action vigorously. Neither Plaintiff nor her counsel has any interest which might cause them to not vigorously prosecute this action. The interests of the Class Members will be fairly and adequately protected.

70. Under Rule 23(b), this action may be maintained as a class action because DraftKings has acted or refused to act on grounds that apply generally to the Class through its employment of a deceptive user interface for placing bets that involve odds changes during the betting process. As such, final equitable and/or injunctive relief or corresponding declaratory relief is appropriate as to all Class Members.

71. A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Rule 23(b)(3). Prosecuting separate actions on behalf of individual class members would create a risk of inconsistent or contradictory adjudications/judgments and increases the delay and expense to all parties and the court system presented by the complex legal and factual issues implicated in this case. The injury suffered by each individual Class Member is

relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct, making it difficult or impossible for Class Members individually to redress effectively the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not. If prosecuted as a class action, this action will present far fewer management difficulties and provide the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

72. Additionally, questions of law and fact common to Class Members predominate here. The Class brings claims focused on DraftKings's design interface for the multi-step wagering process. Although different users of DraftKings's sports betting platform will place different bets at various odds, all users must navigate this same deceptive design interface.

73. Finally, upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' MUP records and database of complaints.

**FIRST CAUSE OF ACTION**
**By Plaintiff Individually and on Behalf of the Nationwide Class and Colorado Class for Violations of the Massachusetts Consumer Protection Act**
**(Mass. G.L. c. 93A)**

74. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

75. The Massachusetts Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. G. L. c. 93A, § 2.

76. DraftKings is a Massachusetts company engaged in trade or commerce within the meaning of the Massachusetts Consumer Protection Act, § 1(b).

77. DraftKings's foregoing acts and practices were directed at consumers from within the Commonwealth of Massachusetts.

78. DraftKings's foregoing acts and practices occurred in the course of its business of offering Sportsbook services to consumers, including Plaintiff and Class Members, which constitutes trade or commerce under the MCPA.

79. DraftKings maintains a deceptive user interface for placing bets that are subject to changed odds during the wagering process.

80. DraftKings's interface employs deceptive "dark patterns" that mislead consumers about the consequences of the actions they take within the interface.

81. By sometimes using a five-step process for finalizing bets, and other times using a four-step process, DraftKings confuses users about what the final action step is on their end before their bet will be accepted and finalized by DraftKings.

82. Moreover, DraftKings places action buttons with large font and bright colors more conspicuously on users' screens than other information that is critical to users' making an informed choice on whether to accept odds changes.

83. DraftKings's practices are contrary to the reasonable expectations of Plaintiff and Class Members, and have lured them into finalizing bets that they did not intend to place.

84. As a result, Plaintiff and Class Members have suffered damages in the amount of the bets placed when those bets have been unsuccessful.

85. DraftKings has maintained its deceptive odds change policies with the intent that they deceive users or, at a minimum, with knowledge that they are deceptive or reckless indifference to the substantial risk that they are deceptive to users.

86. DraftKings's conduct constitutes a violation of the MCPA.

87. As a direct and proximate result of DraftKings's deceptive acts and practices, including its representations and omissions, Plaintiff and Class Members have been damaged as alleged herein, and are entitled to recover actual damages and double or treble damages pursuant to the MCPA.

88. In addition, Plaintiff and Class Members seek equitable and injunctive relief against DraftKings on terms that the Court considers reasonable, and reasonable attorney's fees and costs, as permitted by the MCPA.

89. Plaintiff brings this claim under the MCPA pursuant to Mass. G. L. c. 93A, § 9(2), which allows for an MCPA claim to be brought on behalf of a class of similarly injured or harmed individuals.

90. Plaintiff provided thirty days' notice of her claims and of the claims of those similarly situated, including a written demand for relief, pursuant to Mass. G. L. c. 93A, § 9(3). Such notice was mailed directly to Defendants on October 22, 2025.

91. In response, Defendants sent a response letter on November 6, 2025 denying all allegations and claims. Defendants refused to make a reasonable offer of settlement, denying any wrongdoing.

**SECOND CAUSE OF ACTION**
**By Plaintiff Individually and on Behalf of the Colorado Class**
**for Violations of the Colorado Consumer Protection Act**
**(Colo. Rev. Stat. §§ 6-1-105-6-1-116)**

92. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

93. DraftKings's foregoing acts and practices were directed at consumers in the State of Colorado.

94. DraftKings is a "person" as that term is defined in the Colorado Consumer Protection Act, § 6-1-102(6).

95. Plaintiff, the members of the Colorado Class, and the general public are actual or potential consumers of the goods, services, or property of DraftKings.

96. In the course of DraftKings's business, vocation, or occupation, DraftKings has engaged in unfair or deceptive trade practices as that term is defined in the Colorado Consumer Protection Act, § 6-1-105, including, but not limited to, the definition of unfair or deceptive trade practices set forth in subsection (rrr) of § 6-1-105.

97. DraftKings maintains a deceptive user interface for placing bets that are subject to changed odds during the wagering process.

98. DraftKings's interface employs deceptive "dark patterns" that mislead consumers about the consequences of the actions they take within the interface.

99. By sometimes using a five-step process for finalizing bets, and other times using a four-step process, DraftKings confuses users about what the final action step is on their end before their bet will be accepted and finalized by DraftKings.

100. Moreover, DraftKings places action buttons with large font and bright colors more conspicuously on users' screens than other information that is critical to users' making an informed choice on whether to accept odds changes.

101. DraftKings's practices are contrary to the reasonable expectations of Plaintiff and the Colorado Class, and have lured them into finalizing bets that they did not intend to place.

102. As a result, Plaintiff and the Colorado Class have suffered damages in the amount of the bets placed when those bets have been unsuccessful.

103. DraftKings has maintained its deceptive odds change policies with the intent that they deceive users or, at a minimum, with knowledge that they are deceptive or reckless indifference to the substantial risk that they are deceptive to users.

104. DraftKings's conduct constitutes a violation of the CCPA.

105. As a direct and proximate result of DraftKings's unfair or deceptive trade practices, including its representations and omissions, Plaintiff and the Colorado Class have been damaged as alleged herein, and are entitled to recover actual damages, injunctive relief to the extent permitted by law, and reasonable attorney fees and costs under the CCPA.

106. Plaintiff brings this claim under the CCPA § 6-1-113, which allows for a CCPA claim to be brought on behalf of a class of similarly injured or harmed individuals.

**THIRD CAUSE OF ACTION**
**By Plaintiff Individually and on Behalf of the Class**
**for Unjust Enrichment**

107. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

108. As described herein, DraftKings has maintained a deceptive user interface for bets placed on its platform where the odds change during the bet placement process. This interface does not adequately alert users that in "accepting" odds changes, a bet will be placed for them at the changed odds. As a result, Plaintiff and Class Members have placed bets they did not intend to place.

109. Due to its deceptive user interface, DraftKings has knowingly and unjustly been enriched by the amounts wagered when these bets have lost, at the expense of and to the detriment of Plaintiff and Class Members.

110. DraftKings has wrongfully refused to refund amounts unintentionally wagered by Plaintiff and Class Members. DraftKings's refusal to refund these unintentionally placed bets has resulted in Defendants improperly and unjustly retaining the amounts wagered. Defendants should be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding Plaintiff and the Class the amount of the damages they have sustained as a result of DraftKings's violations of law set forth herein;

B. Ordering DraftKings to disgorge monies they have retained from bets placed by Plaintiff and the Class as a result of DraftKings's wrongful conduct;

C. Awarding prejudgment interest to Plaintiff and the Class;

D. Granting appropriate equitable relief to remedy DraftKings's violations of law;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 10, 2026

Respectfully submitted,

/s/ John S. Sanner
***Lawrence P. Eagel (Application for admission pending)***
***John S. Sanner***
BRAGAR EAGEL & SQUIRE, P.C.

1675 Broadway, 14th Floor
New York, NY 10019
Telephone: (212) 355-4648
Email: walker@bespc.com
eagel@bespc.com
sanner@bespc.com

***Melissa A. Fortunato (Application for admission pending)***
BRAGAR EAGEL & SQUIRE, P.C.
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 341-9980
Email: fortunato@bespc.com

Attorneys for Plaintiff and Class Members